# UNITED STATES DISTRICT COURT

## DISTRICT OF MAINE

| | |
|---|---|
| CARL D. McCUE, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 1:12-cv-00204-JDL |
| ) | |
| SETH BRADSTREET, III, ) | |
| ) | |
| Defendant. ) | |

## ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

This matter is before the court on the Motion for Summary Judgment filed by

the defendant, Seth Bradstreet, III (ECF No 38). After careful review, I conclude that

Bradstreet's motion for summary judgment should be **GRANTED**.

## I. INTRODUCTION

Carl McCue claims that in 2006 and 2007, Bradstreet, then the Maine

Commissioner of Agriculture, retaliated against him for constitutionally-protected

speech.[1] He seeks relief pursuant to 42 U.S.C. § 1983. *See* Complaint, ECF No. 1.

McCue is a dairy farmer with a history of allegations that he engaged in poor

animal waste management at his farm in Dixmont, Maine, made by local residents

and officials of the Maine Department of Agriculture ("DOA"). ECF No. 1 at 3; ECF

No. 37-1 at 1. Despite his record, McCue alleges that for years, the DOA took no

enforcement action against him and even protected him from enforcement action by

---

[1] McCue stated several claims in the Complaint, but he only contested the First Amendment retaliation claim in his summary judgment opposition. See ECF No. 38 at 6, n.6.

the Maine Department of Environmental Protection ("DEP"). Pl.'s Stmt. of Undisp. Mat. Facts, ECF No. 57 at 85, ¶200. McCue further alleges that shortly after Bradstreet became the DOA's Commissioner in March 2006, the DOA abruptly changed its protective posture toward him and allowed the DEP to proceed with enforcement action. ECF No. 1 at 1. McCue asserts that he and Bradstreet shared a bitter personal history arising out of a dispute that preceded Bradstreet's appointment as DOA Commissioner. The dispute centered on a federal crop subsidy that both men competed for, and which was the subject of a successful appeal that McCue filed with the U.S. Department of Agriculture ("U.S.D.A."). ECF No. 57 at 88, ¶¶210-215. McCue further alleges that, as a result of his successful appeal to the U.S.D.A., Bradstreet was required to repay approximately $7,000 to the U.S.D.A. shortly after he took office as Commissioner of Agriculture, and that an angry and retaliatory Bradstreet subsequently caused his subordinates at the DOA to "give up" McCue to the DEP for enforcement. ECF No. 45 at 1-2. This enforcement action allegedly caused McCue to lose financing he had secured for upgrades and equipment on the farm, ultimately leading to his loss of the farm altogether. ECF No. 57 at 98-99, ¶¶241-244.

## II. FACTUAL BACKGROUND

A brief overview of the agricultural and environmental regulation of cow manure in Maine is necessary in order to put the full record in context.

Although manure is a valuable resource as a natural fertilizer, it can also degrade environmental quality if not properly managed, particularly if a farm that

produces animal waste is located near a body of water. Def.'s Stmt. of Undisp. Mat. Facts, ECF No. 33 at 1, ¶1. Due to these environmental concerns, the State requires farms that meet certain statutory criteria to develop and abide by a "Nutrient Management Plan," a written document that establishes how the farm will store, manage, and use manure. *Id.* at 1-2, ¶¶3, 4 (*citing* 7 M.R.S. § 4204). If a farm raises and keeps cows in confined conditions within a small area, then state regulators may determine that the farm qualifies as a "Concentrated Animal Feeding Operation." *Id.* at 2, ¶¶7, 8. Because such farms have a smaller land area upon which to spread cow manure, Concentrated Animal Feeding Operations pose heightened concerns of manure spilling or seeping into nearby bodies of water. *Id.* These concerns are compounded further during the winter months, when the ground is frozen and manure that is spread on the ground can run off into nearby bodies of water. ECF No. 57 at 110, ¶288.

Against this background, the summary judgment record, viewed in the light most favorable to McCue, as the non-moving party, reveals the following facts.

## A. McCue's History with the DOA

From 2004 through early 2007, McCue was the sole shareholder of Country Acres Farms, Inc., which owned and operated a dairy farm ("Country Acres" or "the Farm") in Dixmont, Maine.[2] ECF No. 1 at 3. The Farm, home to as many as 500 cows, generated a significant amount of manure that was stored on-site in two

---

[2] The complaint states that, as of 2004, McCue was the sole shareholder in the corporation which owned and operated the Farm. However, the evidentiary record reflects that McCue was a principal of Country Acres in some form as far back as 1985. *See* ECF No. 52.

manure storage pits, an "old" one and a "new" one. ECF No. 33 at 3, ¶¶11, 12. The Farm's old manure pit was located approximately 300 feet from Martin Stream, which is classified by Maine statute as a "Class A" waterway, thus signifying that it is suitable for fishing and recreation, as a habitat for fish and other aquatic life, and for drinking water after disinfection. ECF No. 37 at 3-4, ¶12.

McCue's manure management practices were alleged to be deficient, as evidenced by a record of complaints lodged by citizens of Dixmont and by scrutiny he received from the DOA over a period of years. ECF No. 36 at 2, ¶¶7, 8; ECF Nos. 34-3, 52, and 37-1 at 1. In February and November 2000, the DOA inspected Country Acres and noted that "[i]t is apparent that you [McCue] continue to ignore recommendations of this Department to comply with Best Management Practices." ECF Nos. 52 and 52-1. In November 2002, a DOA official inspected Country Acres again and noted that the Farm did not meet most of the requirements of state nutrient management law and recommended against issuing a Livestock Operations Permit. ECF No. 34-3 at 6. A January 2004 inspection by the DOA "revealed that unacceptable progress has been made to lower the [manure] pit to an acceptable level." ECF No. 52-2.

While DOA officials may have criticized McCue, there is no indication that they took formal enforcement action against Country Acres, either. In fact, in April 2003, the DOA granted Country Acres a provisional Livestock Operations Permit on the condition that McCue comply with certain specific conditions, including paving the yard in front of the Farm's barn and developing a carcass disposal plan. ECF No. 34-

4 at 2. Deputy DOA Commissioner Edwin Porter ("Porter") testified that it was the DOA's preference to refrain from taking enforcement action against a farmer as long as the farmer was making "significant progress" with regard to manure management requirements. Porter Dep., ECF No. 30-18 at 8.

In July 2005, prompted by complaints from local residents, DEP officials inspected Country Acres and found that manure was leaking into Martin Stream. ECF No. 37-1 at 2. Officials from both the DEP and the DOA then performed a follow-up inspection in August, after which they met and determined that Country Acres should be jointly licensed by both agencies as a Concentrated Animal Feeding Operation. Doak Aff., ECF No. 35 at 2, ¶9; ECF No. 37-1; *see also* ECF Nos. 36-2 and 36-3.

The DEP informed McCue of the two agencies' licensing determination in late August 2005, and, in the same letter, it also issued a notice of violation for the deficiencies observed during the recent inspections. ECF No. 37-1 at 1. According to DEP official James Crowley, the notice of violation constituted an enforcement action, which "catalyzed a 'significant' inter-departmental conflict" between the DEP and the DOA, notwithstanding their recent joint action. ECF Nos. 32-2 at 1 and 47—1. The DOA was concerned that taking any enforcement action against McCue might jeopardize funding for Country Acres from the federal Natural Resources Conservation Service ("NRCS"). *See id.* Therefore, just one month after jointly determining that Country Acres should be licensed as a Concentrated Animal Feeding Operation, the two agencies changed tack and decided that the DOA, alone,

would oversee the necessary permitting of Country Acres. *Id.* According to Crowley, the DEP enforcement action would "evaporate." ECF No. 30-20.

In October 2005, McCue submitted an application for a Livestock Operations Permit to the DOA (ECF No. 34-6) as part of the Concentrated Animal Feeding Operation permitting process, but the application failed to document that McCue owned sufficient land on which to spread or store manure, or that he had permission to spread or store manure on someone else's land. ECF No. 34 at 7, ¶29. Mark Hedrich, the DOA's Nutrient Management Coordinator, wrote to McCue to inform him that the DOA could not process his application until he provided more information. ECF No. 34-7. McCue did not immediately respond to Hedrich.[3] Hedrich Aff., ECF No. 34 at 9, ¶34.

By February 2006, the two agencies were once again receiving citizen complaints about manure-handling practices at Country Acres. *See* ECF No. 36 at 4, ¶¶17-19; ECF Nos. 35-7 and 36-10. Sheila Doak, the director of the DOA's Animal Health and Industry Division, wrote to local Dixmont activist Peter Hickey that McCue was "continuing to work with a representative from the NRCS," and that "[w]e continue to work diligently with Carl to outline short and long term solutions for these two manure pits." ECF No. 30-23. DEP official James Crowley explained to Hickey that "the DEP can't 'take over' the case, for enforcement or unilateral

---

[3] When McCue did submit the requested documentation a year later, in October 2006, Hedrich found discrepancies between (1) the amount of land that McCue reported he had available upon which to spread manure, and (2) the amount of land that was reflected in his Nutrient Management Plan. ECF No. 34 at 11, ¶41; ECF No. 33 at 15, ¶91. Because of these discrepancies, and because DOA regulations required a nutrient management plan to be updated when there is a 15% or greater change in the acreage upon which manure is to be spread, Hedrich determined that Country Acres' Nutrient Management Plan needed to be updated. ECF No. 34 at 12, ¶44; ECF No. 33 at 15, ¶93.

licensing, unless requested to do so from Agriculture," and stated that "I'd be willing to bet that there are other similar situations around the state that are in similarly rough shape, but that aren't getting any attention, due to lack of any local guardian angels." ECF No. 30-24 at 1.

Bradstreet was nominated by Governor John Baldacci to be the Commissioner of Agriculture on March 7, 2006, and took office on March 27. ECF No. 1 at 9, ¶42.

## B. The Crop Subsidy Dispute

Somewhat contemporaneously with the events described above, McCue and Bradstreet entered into and fell sharply out of a business relationship concerning corn.

In October 2004, McCue leased farmland from Bradstreet in order to grow corn to feed his dairy cows, and began planting the first crop during the 2005 season. ECF No. 1 at 3-4, ¶¶9, 13. This corn crop was eligible for a federal crop subsidy administered by the U.S.D.A.'s Farm Service Administration (the "Farm Service Administration"). *Id.* at 4, ¶15. At some point in the fall of 2005, McCue and Bradstreet had a telephone conversation in which it emerged that they both intended to apply to the Farm Service Administration for a crop subsidy in direct competition against each other. ECF No. 57 at 89, ¶¶211, 212. This caused their relationship to sour dramatically. ECF No. 57 at 88, ¶210. Bradstreet admits that he became very upset during this phone call and threatened to "ruin" and "bury" McCue and put him out of business. *Id.*; ECF No. 59 at 13, ¶213.

In December 2005, the Farm Service Administration's local committee (the "FSA Committee") awarded the crop subsidy payment to Bradstreet, prompting McCue to file multiple rounds of appeals culminating with an April 2006 appeal to the U.S.D.A.'s National Appeals Division.[4]  ECF No. 1 at 7-9, ¶¶31, 33, 41.  In April 2006, McCue won his appeal and Bradstreet received a demand from the U.S.D.A. to repay the approximately $7,000 subsidy he had received.  ECF No. 57 at 14-15, ¶25; ECF No. 47-4; Bradstreet Dep., ECF No. 39 at 14-15.

## C. Bradstreet's Recusal from Matters Related to McCue

Having won his appeal to the U.S.D.A., McCue sought to resolve any "hard feelings" about the subsidy dispute and scheduled a meeting with Bradstreet at the DOA for late June.  ECF No. 44 at 13-14, ¶¶52, 53.  Bradstreet received an email from his administrative assistant informing him of the meeting and promptly recused himself from matters involving McCue to avoid the possibility of adverse actions by the DOA being characterized as retaliation.[5]  ECF No. 39 at 14, 17; ECF No. 57 at 93, ¶224.  Bradstreet communicated his recusal orally to his deputy commissioner, Edwin Porter, but did not prepare a document that memorialized his recusal or his delegation of matters involving McCue to his deputies.  ECF No. 30-18 at 18.

---

[4] McCue alleges that Bradstreet fraudulently pursued the crop subsidy in the first place, and that he used his position as chairman of the local farm committee to influence the handling of the subsidy dispute with McCue.  ECF No. 57 at 90; ECF No. 45 at 11.  These allegations are not material facts for purposes of a summary judgment determination because the retaliation that McCue alleges Bradstreet to have engaged in is retaliation in his role as the DOA Commissioner.  ECF No. 45 at 1-4.

[5] As discussed in greater detail below, Bradstreet also told Assistant Attorney General Mark Randlett, who represented the DOA, that he "had some business dealings that weren't the greatest with Mr. McCue."  ECF No. 39 at 14.

McCue was not informed of Bradstreet's recusal before the June 2006 meeting. ECF No. 39 at 14; ECF No. 44 at 14-15, ¶¶54, 58. Thus, when McCue arrived for the meeting, it was Porter who met him and informed him of Bradstreet's recusal, citing "issues" and "hard feelings" between the two men. ECF No. 44 at 14, ¶54; ECF No. 30-18 at 23. Porter and a group of five officials from the DOA and the DEP then proceeded to inform McCue that Country Acres was under strict scrutiny, and that they might find the Farm to be in violation of permit and regulatory requirements despite steps McCue was taking to improve manure management. ECF No. 44 at 14-15, ¶¶54, 58. Porter later testified that he made the decision to inform McCue of Bradstreet's recusal "by the seat of his pants." ECF No. 30-18 at 38.

McCue cites two instances as evidence that Bradstreet violated his recusal, but both occurred in 2007 after McCue transferred ownership of Country Acres to Agri-Max Financial Service, LLC ("Agri-Max"), the Farm's lender, in July 2007. ECF No. 30-2 at 40. The first possible violation occurred on July 25, 2007, when Shelly Doak sent an email regarding the change in ownership at Country Acres to numerous officials from multiple state and federal agencies, including Bradstreet, congratulating the recipients for a "great job!" ECF No. 30-43. The second possible violation occurred when Bradstreet discussed Country Acres in a telephone conversation with Leon Graves, a former Vermont Agriculture Commissioner who took over management of the Farm after McCue transferred its ownership to Agri-Max. ECF No. 39-1 at 8; ECF No. 57 at 94, ¶¶228, 229; ECF No. 30-43; ECF No. 30-2 at 40.

**D. Allegations of Adverse Actions by the DOA**

McCue alleges that beginning in May 2006, approximately the same time as Bradstreet repaid the corn subsidy, the DOA began to take a series of adverse actions against him due to Bradstreet's retaliatory animus over the U.S.D.A. appeal. ECF No. 45 at 4. First, McCue argues that the DOA suddenly decided to drop its objection to enforcement action by the DEP. He points to a series of emails from DEP official James Crowley, the first of which is dated May 10, 2006, and states that "[i]t looks like Agriculture is going to give this guy [McCue] up after all." *Id.* (*citing* ECF No. 30-25 at 1). McCue also cites a May 30 email from Crowley to Peter Hickey, stating that "[a]pparently Agriculture … has decided that the DEP can go ahead and license McCue, so we've worked up a permit … I think the approach that DEP upper management has taken is to get McCue permitted first, and then commence enforcement if (most likely when) he's found in violation of his permit conditions." ECF No. 30-27. The next day, Crowley emailed Hickey again, stating that:

> there always seems to be a battle when overall public & environmental interests come into conflict with anyone's economic interests. This particular "conflict" is exacerbated by [the DOA's] protective approach to the farms. There are others, too, that need a more forceful & less enabling approach, but it looks like Carl McCue & Co. have managed to fall far enough out of their graces that [the DOA] actually handed them over.

ECF No. 30-28.

McCue also points to the June 2006 meeting as another adverse action, as well as the DOA's decision in November 2006 to revoke his provisional Livestock Operations Permit. ECF No. 45 at 4. The letter informing McCue of the revocation

10

stated that it was due to McCue's "failure to comply with the provisions outlined in the permit … [including] … failure to implement the Nutrient Management Plan; multiple failures to report manure spillages of discharges to the Department that were likely to have had a negative impact on a water body or sensitive land use … and failure to adequately pave or otherwise surface the areas in front of the barns." ECF No. 30-32 at 1. The DOA also sent the revocation letter to Agri-Max, with whom McCue had been working to secure a loan to make improvements to Country Acres in order to bring the Farm into compliance with environmental standards. ECF No. 57 at 99, ¶¶246, 247. McCue appealed the revocation at a hearing on November 30, 2006, but Porter, the Deputy DOA Commissioner, denied it on December 27, 2006. ECF No. 35-10.

The final adverse action cited by McCue occurred in December 2006, when he applied for a variance from Maine's winter ban on manure spreading and was denied. ECF No. 45 at 4. In her letter denying the variance, Shelley Doak cited the same discrepancies noted by Mark Hedrich several months earlier with regard to the amount of land cited in Country Acres' Nutrient Management Plan versus the actual amount of land available for spreading manure. *See* ECF No. 35-11.

### E. McCue's Loss of the Farm

On December 7, 2006, the EPA issued an administrative order against Country Acres for violating the Clean Water Act, citing observations made by DEP officials during their prior inspections. ECF No. 33 at 24, ¶143. The administrative order directed McCue to submit for EPA approval a plan for completely emptying the old

manure pit and partially emptying the new manure pit.  *Id.* at ¶146.  Approximately

one month later, in January 2007, the EPA filed suit against McCue in this court for,

among other things, violations of the Clean Water Act and its December 2006

administrative order, citing the fact that McCue still had not emptied the old manure

pit or submitted a plan for doing so.  *Id.* at ¶¶148, 150.  In March, McCue agreed to a

consent order which required him to take certain corrective measures at the Farm.

*Id.* at 25, ¶153.  On July 24, 2007, this court entered an order holding McCue and

Country Acres in contempt for having "repeatedly violated" the consent order.  *Id.* at

¶154.  McCue subsequently entered into an agreement with Agri-Max, whereby he

agreed to transfer ownership of Country Acres to Agri-Max in exchange for Agri-

Max's agreement to perform various remedial measures required by the consent

order.  ECF No. 30-2 at 40.

## III. SUMMARY JUDGEMENT STANDARD

### A. Federal Rule of Civil Procedure 56

Summary judgment is appropriate "if the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law."  Fed. R. Civ. P. 56(a); *Ahmed v. Johnson*, 752 F.3d 490, 495 (1st Cir.

2014).  "A dispute is genuine if 'the evidence about the fact is such that a reasonable

jury could resolve the point in the favor of the non-moving party.'"  *Johnson v.

University of Puerto Rico*, 714 F.3d 48, 52 (1st Cir. 2013) (*quoting Thompson v. Coca-

Cola Co.*, 522 F.3d 168, 175 (1st Cir. 2008)).  "A fact is material if it has the potential

of determining the outcome of the litigation." *Id.* (*quoting Maymi v. P.R. Ports Auth.*, 515 F.3d 20, 25 (1st Cir. 2008)).

The party moving for summary judgment must demonstrate an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). In determining whether this burden is met, the court must view the record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences in its favor. *Johnson*, 714 F.3d at 52. Once the moving party has made a preliminary showing that no genuine issue of material fact exists, the nonmovant must "produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue." *Brooks v. AIG SunAmerica Life Assur. Co.*, 480 F.3d 579, 586 (1st Cir. 2007) (*citing Clifford v. Barnhart,* 449 F.3d 276, 280 (1st Cir. 2006)); Fed. R. Civ. P. 56(c). "As to any essential factual element of its claim on which the nonmovant would bear the burden of proof at trial, its failure to come forward with sufficient evidence to generate a trialworthy issue warrants summary judgment to the moving party." *In re Spigel*, 260 F.3d 27, 31 (1st Cir. 2001) (citation and internal punctuation omitted).

## B. Local Rule 56

The evidence that the court may consider in deciding whether genuine issues of material fact exist for purposes of summary judgment is circumscribed by the local rules of this district. *See* Loc. R. 56. The moving party must first file a statement of material facts that it claims are not in dispute. *See* Loc. R. 56(b). Each fact must be set forth in a numbered paragraph and supported by a specific record citation. *See*

*id.* The nonmoving party must then submit a responsive "separate, short, and concise" statement of material facts in which it must "admit, deny or qualify the facts by reference to each numbered paragraph of the moving party's statement of material facts[.]" Loc. R. 56(c). The nonmovant likewise must support each denial or qualification with an appropriate record citation. *See id.* The nonmoving party may also submit its own additional statement of material facts that it contends are not in dispute, each supported by a specific record citation. *See id.* The movant then must respond to the nonmoving party's statement of additional facts, if any, by way of a reply statement of material facts in which it must "admit, deny or qualify such additional facts by reference to the numbered paragraphs" of the nonmovant's statement. *See* Loc. R. 56(d). Again, each denial or qualification must be supported by an appropriate record citation. *See id.*

Local Rule 56 directs that "[f]acts contained in a supporting or opposing statement of material facts, if supported by record citations as required by this rule, shall be deemed admitted unless properly controverted." Loc. R. 56(f). In addition, "[t]he court may disregard any statement of fact not supported by a specific citation to record material properly considered on summary judgment" and has "no independent duty to search or consider any part of the record not specifically referenced in the parties' separate statement of fact." *Id.*; *see also, e.g., Borges, ex rel. S.M.B.W. v. Serrano-Isern*, 605 F.3d 1, 5 (1st Cir. 2010); Fed. R. Civ. P. 56(e)(2) ("If a party fails to properly support an assertion of fact or fails to properly address another

party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion[.]").

## IV. LEGAL ANALYSIS

State actors "offend the First Amendment when they retaliate against an individual for constitutionally protected speech." *González–Droz v. González–Colón,* 660 F.3d 1, 16 (1st Cir. 2011); *see also Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 280–81 (1977). In order to establish a *prima facie* case of First Amendment retaliation, a plaintiff must show: (1) that he engaged in constitutionally protected conduct; (2) that he was subjected to an adverse action by the defendant; and (3) that the protected conduct was a substantial or motivating factor in the adverse action. *D.B. ex rel. Elizabeth B. v. Esposito,* 675 F.3d 26, 43 (1st Cir. 2012).

With regard to the second element, an adverse action for purposes of a First Amendment case is one that "viewed objectively ... would have a chilling effect on [the plaintiff's] exercise of First Amendment rights," *Barton v. Clancy,* 632 F.3d 9, 29 & n.19 (1st Cir. 2011), or that "would deter a reasonably hardy person from exercising his or her constitutional rights." *D.B.*, 675 F.3d at 43 n.11.

If a plaintiff establishes a *prima facie* case of First Amendment retaliation, then the defendant may avoid a finding of liability by showing that "it would have reached the same decision ... even in the absence of the protected conduct." *D.B.*, 675 F.3d at 43 (*quoting Powell v. Alexander,* 391 F.3d 1, 17 (1st Cir. 2004)); *see also González–Droz,* 660 F.3d at 17.

## A. McCue's Alleged Amended Theory of the Case

As an initial matter, Bradstreet claims that McCue has impermissibly amended his theory of the case at the summary judgment stage. Def.'s Reply Br., ECF No. 58 at 2-3. In the complaint, McCue claimed that there was no evidence that Bradstreet recused himself from matters pertaining to McCue. *See* ECF No. 1 at 2, ¶2 and 12, ¶62. In his summary judgment brief, however, McCue asserted that Bradstreet issued a "tainted" recusal by unnecessarily expressing negative feelings toward McCue to his subordinates. Pl.'s Opp'n. Br., ECF No. 45 at 3, 8-11. Bradstreet argues that in light of this difference between the complaint and McCue's summary judgment brief, McCue should not be permitted to assert that Bradstreet's recusal was tainted. ECF No. 58 at 3. I am not persuaded by this argument for the following reasons.

McCue's complaint placed Bradstreet on notice that his recusal was being challenged, in conformance with the notice pleading requirement contained in Federal Rule of Civil Procedure 8. The allegations contained in the complaint and in McCue's opposition brief both lead to the same conclusion, i.e., that Bradstreet either took adverse action or caused adverse action to be taken against McCue. Furthermore, "[w]hile it is not fair to allow a plaintiff, without prior notice or amendment of their complaint, to contradict material parts of their stated claims in an effort to defeat summary judgment, nothing in the rules suggests that a party must be rigidly held to every detail of its pleadings at summary judgment." *U.S. v. Conagra Grocery Products Co., LLC*, --- F.Supp.2d ---, 2014 WL 971973, *10 (D.

Maine, March 12, 2014).  McCue's argument concerning the allegedly tainted recusal is properly before the court.

## B.  McCue's Evidentiary Burden

McCue seeks to lower his evidentiary burden by citing the United States Supreme Court's opinion in *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 98 (2003), for the proposition that his evidence "need only be sufficient for a jury to reasonably find that … Bradstreet's retaliatory animus *played a part in or was considered* regarding the adverse actions taken by [the DOA."  ECF No. 45 at 5 (emphasis added).  McCue's reliance on the case is misplaced.

*Desert Palace* explicitly allowed circumstantial evidence to prove claims of employment discrimination under Title VII.  *See Desert Palace*, 539 U.S. at 101*; see also Chadwick v. WellPoint, Inc.*, 561 F.3d 38, 46 (1st Cir. 2009).  There is nothing in the *Desert Palace* opinion which supports McCue's claim that the causal connection factor has been watered down so that a plaintiff no longer needs to show that his protected speech was a "substantial or motivating factor" in the adverse action.  *See Desert Palace*, 539 U.S. 90.  Rather, the court must determine whether there exists sufficient evidence for a jury to reasonably conclude that McCue's protected conduct was a substantial or motivating factor in any alleged adverse action.  *See D.B.*, 675 F.3d at 43.

**C. McCue's *Prima Facie* Case**

**1. The First Element: Constitutionally-Protected Speech**

There is no dispute that McCue's appeal to the U.S.D.A. was constitutionally-protected speech. *See* ECF No. 38 at 7. Accordingly, McCue has satisfied the first element of a *prima facie* case of First Amendment retaliation.

**2. The Second Element: Adverse Action by the Defendant**

An action is an "adverse action" for First Amendment retaliation purposes when "the defendant's actions would deter 'a reasonably hardy individual[ ]' from exercising his constitutional rights." *Barton v. Clancy*, 632 F.3d 9, 29 (1st Cir. 2011). The First Circuit has held that even "relatively minor events" can give rise to section 1983 liability. *Id.* (*citing Rivera-Jimenez v. Pierluisi*, 362 F.3d 87, 94 (1st Cir. 2004)).

McCue alleges four adverse actions: the DOA's alleged decision as of May 2006 to allow the DEP to pursue enforcement actions against Country Acres; the June 2006 meeting between McCue, Porter, and numerous officials from the DOA and DEP, where McCue was told that the Farm was under "strict scrutiny;" the November 2006 revocation of McCue's provisional Livestock Operations Permit; and the December 2006 denials of his application for a variance from the winter ban on manure spreading. ECF No. 45 at 4, 14. McCue argues that under the *Barton* standard, all of the alleged DOA actions would likely deter a reasonably hardy individual in McCue's circumstances from exercising his constitutional rights. ECF No. 45 at 14.

As to the first alleged adverse action, McCue cites evidence that the DOA adopted a tougher enforcement policy towards Country Acres after Bradstreet took

office as Agriculture Commissioner.  ECF No. 45 at 6-7.  McCue notes that before Bradstreet took office, DOA officials "protected" Country Acres by, for example, objecting to the August 2005 notice of violation that the DEP issued to Country Acres. *Id.* (*citing* ECF No. 47-1).  McCue also cites James Crowley's February 2006 emails to Peter Hickey, in which he discussed the DOA's traditionally "glacial" pace in pursuing farms that violated environmental regulations, and wrote that the DEP could not take enforcement action without first being requested to do so by the DOA. *Id.* (*citing* ECF No. 37-3 at 1).  For evidence of the DOA's allegedly stricter approach after Bradstreet took office, McCue cites Crowley's May 2006 emails, in which he told Hickey that "it looks like Carl McCue & Co. have managed to fall far enough out of [DOA's] graces that DOA actually handed them over."  *Id.* at 6 (*citing* ECF No. 30-28).

The probative value of the Crowley emails is undercut by Crowley's affidavit stating that "[m]y understanding was that [McCue] fell out of [DOA's] graces because of his long history of questionable farm management."  ECF No. 37 at 6-7, ¶26; ECF No. 45 at 1-2, 4.  Nevertheless, when viewed in the light most favorable to McCue as the non-movant, the evidence above suggests the possibility of some shift at the DOA which was roughly contemporaneous with the beginning of Bradstreet's tenure as the Agriculture Commissioner.  This proof satisfies the adverse action element of McCue's *prima facie* case of First Amendment retaliation.

The remaining adverse actions are more straightforward. The June 2006 meeting at which McCue was told that Country Acres was under strict scrutiny

satisfies the adverse action element because placing a farm or other business under "strict scrutiny" clearly implies a heightened level of regulatory oversight, and could reasonably be said to have a chilling effect on the owner's exercise of First Amendment rights. *See Blankenship v. Manchin*, 471 F.3d 523, 530 (4th Cir. 2006) ("Tougher scrutiny by agencies whose actions are afforded a presumption of regularity is adverse regulatory action, because it implies harsher, or at least disparate, treatment of [plaintiff] as a direct result of [plaintiff's] political speech.").

The third and fourth alleged adverse actions that McCue cites, the November 2006 revocation of Country Acres' provisional Livestock Operations Permit and the December 2006 denial of McCue's requests for variances from the winter ban on manure spreading – are tangible acts adverse to McCue taken by the DOA. They therefore also satisfy the adverse action element of a First Amendment retaliation claim. *See D.B.*, 675 F.3d at 43.

### 3. The Third Element: A Causal Connection

#### (a) The DOA's Alleged Shift in Enforcement Policy

McCue argues that temporal proximity alone is sufficient evidence of a causal connection in First Amendment retaliation cases. ECF No. 45 at 6-7 (*citing Thomas v. Eastman Kodak Co.*, 183 F.3d 38, 62 (1st Cir. 1999); *Nethersole v. Bulger*, 287 F.3d 15, 18 (1st Cir. 2002); *Calero-Cerezo v. United States DOJ*, 355 F.3d 6, 25 (1st Cir. 2004); and *Noviello v. City of Boston*, 398 F.3d 76, 86 (1st Cir. 2005)). [6] I conclude

---

[6] Much like the plaintiff in *Thomas v. Eastman Kodak Co.,* 183 F.3d 38, 62 (1st Cir. 1999), McCue produced evidence that could conceivably allow a fact-finder to infer that the DOA's change in enforcement attitude toward him constituted less favorable treatment compared to other farms subject

based upon the factual background of this case that a reasonable jury could infer a causal connection between McCue's protected speech (the initiation of his U.S.D.A. appeal) in December 2005 and the first adverse action he alleges (the DOA's shift in enforcement posture) in May 2006. This five-month time span, standing on its own, would not ordinarily "forge the causal link needed to establish a *prima facie* case of retaliation." *Ahern v. Shinseki*, 629 F.3d 49, 58 (1st Cir. 2010) (discussing temporal proximity in relation to a Title VII claim). Nevertheless, the evidentiary record shows that Bradstreet did not take office – and therefore was not in a position to retaliate – until March 27, 2006, or approximately two months before the alleged adverse action. The record also reflects that Bradstreet received the first demand for repayment of the U.S.D.A. subsidy at the end of April 2006 – approximately two weeks before the alleged adverse action. *Mariani-Colon v. Dept. of Homeland Sec. ex rel. Chertoff*, 511 F.3d 216, 224 (1st Cir. 2007) (concluding that temporal proximity of two months was sufficient to establish a *prima facie* case of retaliation in a Title VII case).

Based upon the totality of these circumstances, a reasonable jury could (although by no means must) conclude that the alleged shift in the DOA's enforcement policy was motivated by McCue's U.S.D.A. appeal, and that Bradstreet retaliated a short time after taking office. *See Porter v. California Dept. of Corrections*, 419 F.3d 885, 895 (9th Cir. 2004) (a valid reason for the delay between

---

to DOA regulation. *See* May 31, 2006 Crowley email, ECF No. 37-6 ("There are others, too, that need a more forceful & less enabling approach."). However, in *Thomas,* the First Circuit focused exclusively on Title VII discrimination and makes no mention of retaliation or temporal proximity whatsoever. For this reason, *Thomas* is an inapposite comparison.

the plaintiff's alleged protected activities and claimed adverse actions was that the defendant was not in a position to retaliate until after he became the plaintiff's supervisor). *See also Mink v. Passport Health Communications, Inc.,* 2013 WL 4008705, *13 (M.D. Tenn. August 5, 2013).

### (b) The Remaining Adverse Actions

The remaining adverse actions occurred after Bradstreet recused himself from matters pertaining to McCue: the June 2006 meeting, the November 2006 revocation of McCue's provisional Livestock Operations Permit, and the December 2006 denial of a variance of the winter ban on manure spreading. ECF No. 38 at 7; *see also* ECF No. 45 at 4; ECF No. 39 at 3. Thus, in order to establish a causal connection between these adverse actions and his U.S.D.A. appeal, McCue argues that Bradstreet's recusal was "tainted" when he disclosed his soured business relationship with McCue to Deputy Commissioner Porter, who then allegedly became a vector for a department-wide infection of Bradstreet's retaliatory animus. ECF No. 45 at 10; ECF No. 57 at ¶200.

Bradstreet informed Porter of his recusal in late May 2006. *See supra*; ECF No. 39 at 14. Porter, in turn, attended the June 2006 meeting with McCue, where he "told everyone at the meeting, including [Mark] Hedrich and [Shelley] Doak, that Commissioner Bradstreet had recused himself because there were issues that caused 'hard feelings' … [which] could not be worked out." ECF No. 57 at ¶200. Therefore, McCue argues, a jury could reasonably infer that upon hearing Porter mention the reason for Bradstreet's recusal, Doak and Hedrich were infected by Bradstreet's

retaliatory animus and took adverse actions against McCue in order to "rid the proverbial king of a bothersome subject."[7]  *Id.* at 11 (*quoting Travers v. Flight Services & Systems, Inc.*, 737 F.3d 144, 147 (1st Cir. 2013)).

None of the facts McCue cites specifically state that Porter "told everyone at the meeting" about the reasons behind Bradstreet's recusal.  *See* ECF No. 44 at 14-15; ECF No. 30-18 at 23; and ECF No. 44-3.  Nevertheless, the evidence does raise a question of fact that must be resolved in McCue's favor as the non-movant.  Specifically, at his deposition, Porter did not deny that he told McCue about Bradstreet's recusal "at the *beginning* of the June 27, 2006 meeting."  ECF No. 30-18 at 23 (emphasis added).  Because Hedrich and Doak were present at the June 2006 meeting, it can be inferred that they were present at the beginning of the meeting and therefore heard Porter tell McCue that there were "hard feelings" between the two men that could not be worked out.  *See* ECF No. 30-18 at 23.

McCue cites *Travers*, *supra*, for the proposition that this alleged disclosure of a soured relationship between McCue and Bradstreet tainted Bradstreet's recusal and imputed his retaliatory animus to his DOA subordinates.  However, a comparison between *Travers* and this case serves to highlight their differences rather than their similarities.  In *Travers*, the First Circuit vacated a district court's grant of summary judgment for the defendant where it found a genuine dispute of material fact as to

---

[7] As discussed above, Hedrich later reviewed McCue's application for a Livestock Operating Permit and found discrepancies between the amount of land reported in the application as available to spread manure versus the amount of land reported in Country Acres' Nutrient Management Plan.  ECF Nos. 34-10.  Doak later denied McCue's application for a variance from the state ban on winter spreading of manure.  ECF No. 35-11.

whether the retaliatory animus of the defendant company's CEO could be imputed to the plaintiff's supervisor. The CEO "bristled so fiercely" at the plaintiff's Fair Labor Standards Act suit that "he expressly and repeatedly demanded that [the plaintiff] be fired." *Travers*, 737 F.3d at 147. He "repeatedly yelled at [the plaintiff's supervisor] to 'get rid of [plaintiff]' and 'talk [plaintiff] into dropping the lawsuit[,]'" and complained on numerous telephone conferences with plaintiff's supervisor and other corporate officers "about how much money the suit was costing the company." *Id.* at 145. He "unabashedly and repeatedly voice[d]" negative sentiments to the plaintiff's supervisor and "direct[ed] the precise action taken." *Id.* at 147.

The plaintiff's supervisor subsequently left the company and a new supervisor fired the plaintiff for violating company policy, whereupon the plaintiff filed a second lawsuit for First Amendment retaliation. *Id.* Although there was no evidence of direct communication between the CEO and the new supervisor, the First Circuit nevertheless found that a rational juror could conclude that the CEO's retaliatory animus was so "strongly held and repeatedly voiced," both to the prior supervisor and at least one other corporate officer, that it "likely became well known to those courtiers who might rid him of a bothersome underling." *Id.* at 147.

Here, there was no directive or any other communication from Bradstreet to agency personnel which suggests that Bradstreet ever demanded that his subordinates take adverse action against McCue in the manner of the CEO in *Travers*. Nor is the cited communication between Bradstreet and his subordinates nearly as direct or emphatic as that at issue in *Travers*. Rather, Bradstreet testified

that he told Porter sometime in May 2006 that he and his father "had some past dealings" with McCue "that weren't the greatest" involving a purchase and sale agreement that did not come to fruition and difficulties obtaining timely rent payments from McCue for leased parcels of farmland. ECF No. 39 at 4, 14. Bradstreet's specific testimony on this point was that:

> I ... told [Porter and Assistant Attorney General Mark Randlett] that we had some business dealings that weren't the greatest with Mr. McCue ... I told him we had some tough business dealings before on land rent, and that was, basically, the conversation ... I told him we had a bad, you know, tough situation with land rent and land purchase, sale purchase, and that, you know, it did not end well and that I would be recusing myself.

ECF No. 39 at 14. Such language, spoken on one occasion as an explanation for a recusal, hardly constitutes evidence of Bradstreet's having expressed "strong negative" feelings against McCue to Doak, Hedrich, or other subordinates at the DOA, as McCue argues. ECF No. 45 at 10. Bradstreet also expressly denied ever telling Porter of his repayment of the federal crop subsidy, *id.* at 17, and McCue has not identified any evidence to contradict this assertion, or identified evidence which suggests that Bradstreet ever mentioned the crop subsidy dispute to anyone else at the DOA.

On this factual record, a jury could not reasonably conclude that Doak or Hedrich or other DOA personnel attending the June 2006 meeting were somehow infected with retaliatory animus simply because they heard a second-hand account of "hard feelings" between Bradstreet and McCue which "could not be worked out." *See id.* at 10.

The same can be said with regard to the other record citations that McCue offers to support his "tainted" recusal theory. First is a July 2007 email that Agriculture official Shelly Doak sent more than a year after the McCue meeting (and after Agri-Max took ownership of Country Acres) to numerous officials from multiple state and federal agencies, congratulating the recipients for a "great job!" *Id.* (*citing* Doak Email, ECF No. 30-43). McCue characterizes the tone of the email as having "the flavor of a happy moment" and as "celebrating" McCue's loss of Country Acres as a victory for the DOA. ECF No. 57 at 95-96, ¶229; ECF No. 45 at 10.

A reasonable jury could not treat Doak's email as a basis for finding that Bradstreet's retaliatory animus should be imputed to his subordinates at the DOA. The email contains no reference to any animosity between Bradstreet and McCue. *See* ECF No. 30-43. Any celebratory "flavor" is attributable to the email message's reporting the fact that Country Acres' new management would be "working through the Nutrient Management Plan." *See id*. The "great job!" statement is aimed at a wide circle of actors beyond the DOA, including the DEP, the EPA, the U.S. Department of Justice, and "the Maine farming community." *Id*. McCue offers no evidence that personnel from any of these other agencies were also infected with retaliatory animosity.

McCue also claims that Bradstreet "repeatedly" violated his recusal, citing the Doak email and Bradstreet's phone conversation regarding Country Acres with Leon Graves, a former Vermont Agriculture Commissioner who took over management of the Farm immediately after McCue ceded control of the property to Agri-Max. ECF

No. 39-1 at 8; ECF No. 57 at 94, ¶¶228, 229; ECF No. 30-43. I have already addressed the Doak email, *supra*. With regard to Graves, Bradstreet testified that Graves called sometime in 2007 requesting that Bradstreet expedite either a tank inspection or a water test at Country Acres. ECF. No. 39 at 32. Bradstreet told Graves "I will get word to those folks to expedite whatever you need to do," and testified that "I made sure that the right people knew that this thing was to be expedited." *Id.* Doak's deposition testimony makes clear that Leon Graves became involved with Country Acres only after McCue ceased to own or control it. *See* ECF No. 39-1 at 8. McCue does not offer contrary evidence or explain how expediting an inspection or test at Country Acres *after* McCue's ownership of the Farm had terminated would in any way be an expression of animus against McCue. Thus, it would be unreasonable to conclude that this telephone conversation is evidence of a causal connection between McCue's U.S.D.A. appeal and any adverse action taken by the DOA.

Accordingly, McCue has failed to establish that his U.S.D.A. appeal was a substantial or motivating factor in the remaining alleged adverse actions taken against Country Acres *after* May 2006.

### 4. Whether the DOA Would Have Made the Same Decision Absent McCue's U.S.D.A. Appeal

Despite the fact that McCue has established a *prima facie* case with regard to one alleged adverse action described above, Bradstreet has demonstrated that the DOA would have taken the same adverse actions even absent McCue's U.S.D.A. appeal. *See Mt. Healthy City Sch. Dist. Bd. of Educ.,* 429 U.S. at 287; *Powell v. Alexander*, 391 F.3d 1, 17 (1st Cir. 2004).

With regard to the first two alleged adverse actions, the DOA's alleged shift in approach from protection to enforcement and the June 2006 meeting, McCue does not dispute Bradstreet's assertion that officials from both the DOA and the DEP wrote to Peter Hickey in August 2005 stating that "the two agencies will be developing a set of short term corrective actions as well as more substantial longer term changes to insure that the discharge [into Martin Stream] that occurred this spring will not be repeated." Def.'s Stmt. Undisp. Mat. Facts, ECF No. 33 at 10, ¶57. This correspondence predates both Bradstreet's October 2005 threat and his appointment as Agriculture Commissioner. McCue also does not dispute Doak's statement that, when she was put in charge of the DOA's Nutrient Management Program in September 2005, the DOA was "under increasing pressure to take measures to address" manure discharges into Martin Stream following citizen complaints to the Governor's office. *Id.* at 9-10, ¶¶55-60. Both uncontroverted statements establish that the DOA would have taken enforcement action against Country Acres and subjected the Farm to greater scrutiny as part of its "substantial longer term changes." ECF No. 33 at 10, ¶57.

With regard to the third and fourth alleged adverse actions — the DOA's November 2006 revocation of McCue's provisional Livestock Operations Permit and its December 2006 denial of a variance from the winter ban on manure spreading — Bradstreet set forth statements of material fact based on Doak's and Hedrich's affidavit testimony regarding McCue's poor record of regulatory compliance. Doak stated that in her 11 years working for the DOA, "compliance matters at Country

Acres Farm were the worst of its kind in Maine" with violations that were "the most flagrant and notorious on record." *Id.* at 4, ¶18 (*citing* Doak Aff., ECF No. 35 at 11, ¶50). Hedrich stated that he "never had experience with another farm with such an egregious record of repeated and continued non-compliance with [Maine's] Nutrient Management Law and rules." *Id.* at 3, ¶17 (*citing* Hedrich Aff., ECF No. 34 at 14, ¶53). McCue has failed to effectively deny these statements.[8]

Bradstreet's Statement of Material Facts also establishes that the DOA revoked McCue's provisional Livestock Operations Permit because of the poor conditions that inspectors found on the Farm which violated the terms of McCue's permit.[9] In a November 2006 investigation report, DEP official Alan Hunter stated that he found 13 dead cows lying in a field, the old manure pit full and leaking in several places, and holes in the bottom of the pit. ECF No. 35-8. Hunter also stopped a Country Acres employee as he was spreading manure on a field which Hunter determined already had too much manure on it. *Id.* A December 2006 EPA Administrative Order cited the Hunter report and also cited additional DEP reports

---

[8] In his Opposition to Bradstreet's Statement of Undisputed Material Facts, McCue ostensibly disputes Hedrich's affidavit testimony with eight paragraphs of argument and record citations, including extensive quotations of James Crowley's May 2006 emails, detailed descriptions of the equipment McCue purchased, conclusory statements claiming that McCue was making substantial progress in solving his environmental compliance issues, and speculation about the likelihood of McCue's bringing Country Acres into compliance in early 2007. ECF No. 57 at 7-10, ¶17. None of this response effectively disputes the Statement of Material Fact based on Hedrich's testimony. *See id.* McCue uses precisely the same eight paragraphs to dispute Doak's affidavit testimony, *id.* at 10-13, ¶ 18, but none of it effectively disputes the Statement of Material Fact based on Doak's testimony, either.

[9] The terms of McCue's provisional Livestock Operations Permit included, among other things: (1) developing and complying with a carcass disposal plan, (2) complying with all relevant provisions of the Maine Nutrient Management Law, 7 M.R.S.A. § 4201 et. seq., and (3) reporting any discharges of manure to the DOA within 24 hours. ECF No. 34-4 at 2-3.

of liquid manure draining into Martin Stream. ECF No. 30-10 at 6-7. ¶¶14-16. With this record and Doak's affidavit statement that Hunter's inspection was "the last straw" which caused her to revoke McCue's permit, ECF No. 35 at 7, ¶¶30, 31, no reasonable jury could find that the DOA would have acted differently even absent McCue's U.S.D.A. appeal.

The same can be said regarding the DOA's denial of the requested variance from the winter ban on manure spreading. As discussed above, while reviewing McCue's application, Hedrich found discrepancies between (1) the amount of land that McCue reported he had available upon which to spread manure, and (2) the amount of land that was reflected in his Nutrient Management Plan, leading him to conclude that McCue's Nutrient Management Plan needed to be updated. ECF No. 34 at 12, ¶47; ECF No. 34 at 11, ¶41; ECF No. 33 at 15, ¶91. Additionally, the December 2006 Hunter inspection found that some of the land which McCue stated was available to him for manure spreading was actually being used by another farmer. ECF No. 34-11 at 1. Hunter also discovered that other fields McCue identified as being available for manure spreading "were not mowed or harvested [and] should not be spread on because nutrients have not been taken off." *Id.*

Viewing the above undisputed facts in the light most favorable to McCue, they establish that the DOA would have taken the same enforcement actions against McCue even in the absence of McCue's U.S.D.A. appeal. *See Powell*, 391 F.3d at 17.

## V. CONCLUSION

For the foregoing reasons, Bradstreet's Motion for Summary Judgment is **GRANTED**.

**SO ORDERED.**

**DATED THIS 30th DAY OF JULY, 2014**

_____/S/ JON D. LEVY_____
**JON D. LEVY**
**UNITED STATES DISTRICT JUDGE**